The opinion of the court was delivered by
Nicholls, O. J.
The plaitiff is declared in its petition to be a corporation duly organized under the laws of the Republic of France, a citizen thereof, and therein domiciled i-n the City of Paris, and represented in the suit by its agent, Albert Breton.
Its allegations are that during the year 1897, petitioner, from its said domicile in Paris, through its said agent, transacted in the City of New Orleans a brokerage business, paying thereon a due and proper license tax.
That on the assessment rolls of the First Municipal District, Third Representative, Fifth Assessment District, Square No. 227, it was assessed for the year 1898, as follows:
“Moneys” loaned on interest, all credits, etc............$50,000.00
Money in possession ..................................‘ 50,000.00
That all “credits” for “moneys loaned on interest” are taxable at its domicile in Paris, where it pays its taxes, and not at the domicile of its debtors in the City of New Orleans, and that, therefore, said item “money” loaned on interest, all credits, etc.,” was and remains- an illegal assessment.
That its moneys in possession did not, during the year 1897, exceed, •on an average, more than $20,000.00, nor did it exceed that amount at the time for making the assessment in 1898.
That it made due and timely application to the Board of Assessors for the Parish of Orleans, and later to the Committee on the Revision of Assessments for the Common Council to cancel, from the said assessment rolls of 1898, the assessment of “money loaned on interest, all credits, etc., $50,000.00,” and to reduce the assessment made against it of “money in possession” from $50,000.00 to $20,000.00, and its applications to cancel and reduce said assessments were, without just cause, rejected.
Petitioner annexes copies of said applications.
Its prayer is that the Board of Assessors, by its president; the State of Louisiana, by its Tax Collector, and the City of New Orleans, by the Mayor, be cited to appear and answer this petition, and that after due proceedings had, petitioner have judgment in its favor, ordering the cancellation from the assessment rolls for 1898, of the assessment *1321 against it for “money loaned on interest, all credits, etc.. $50,000.00” (fifty thousand dollars), and reducing the assessment against it of “money in possession,” $50,000.00 to $20,000.00 (twenty thousand dollars), and for costs, and all general relief.
The defendant answered by a general denial.
The District Court rendered judgment' partly in favor of the plaintiff, The Comptoir National D’Escompte de Paris, and partly against it as follows:
“It is ordered, adjudged and decreed that there be judgment in favor of the plaintiff, The Comptoir National D’Escompte de Paris, and against the defendants, The State Tax Collector for the Upper or First District of New Orleans, The Board of Assessors for the Parish of Orleans, and the City of New Orleans, ordering and decreeing that the assessment for the year 1898, against plaintiff on “money in possession,” be reduced from fifty thousand dollars to twenty thousand dollars, and that as to the item “money loaned on interest, all credits, etc., fifty thousand dollars,” the demand of plaintiff be rejected.
“It is further ordered and decreed that the ten per cent, attorney’s fees allowed by law upon the State tax on said amount of' ‘money loaned at interest, all credits, etc.,’ be taxed against the plaintiff, and that all costs of this suit be paid by defendants.”
Plaintiff appealed.
Alfred Breton, agent of the plaintiffs in Louisiana, being upon the stand as a witness, testified substantially as follows:
The plaintiff is a French corporation domiciled in Paris. Its business in Louisiana through witness’ agency was brokerage in money, stocks and bonds,- It has no capital in Louisiana. If the .company loans- money on the agricultural products of the State, it receives for the money which it loans, what are called exchange notes, of which the following marked “O 2” are the regular forms:
$........ 189....
........ promise to pay to Comptoir National D’Eseompte de Paris........
for value received with interest at the rate of... .per cent, per annum. until paid.
This note is not negotiable and is secured by pledge of the securities mentioned on the reverse hereof, and in ease of its non-payment...... or should the drawer hereof when called on, refuse or fail to keep the *1322 margin hereon good, the Comptoir National D’Eseompte de Paris is authorized to sell the said securities at public or private sale, without recourse to legal proceedings, and to make any transfers that may- be required, applying the proceeds of sale towards payment of within note.
C-2:
No.... New Orleans,..........189..
Received from the Agent of the Comptoir National D’Escompte de Paris .................................................. dollars, on account of.........................exchange on.............. arising from shipment and from measures taken preparatory to the shipment of ................................................... per ...................................for ................ which is covered by policies of Insurance against Fire and Marine Risks and which policies are hereby bound and pledged specifically to ..........for the fulfillment of the Contract to furnish the Exchange agreed to and for the money here advanced in case of the non-completion of the contract from any cause. $........
The company does not loan' any money except upon notes of that kind or obligations of that character. Money is loaned principally to cotton and grain people; it lends in New Orleans, Shreveport and all around the Southern States. At least one-half of the money loaned is loaned on cotton and grain in transit which is not in New Orleans, As a rule the money loaned is on cotton and grain to be exported to Europe.
Witness buys foreign drafts on the other side during the time the cotton is in transit; they want money because here as a rule they pay for the cotton as against the railroad bill of lading, and the company through witness loan thereon money; that is for the cotton outside of New Orleans.
The company takes a pledge of the bill of lading and the cotton is brought to New Orleans, Mobile, and Galveston; to different parties. The foreign bill of lading is attached to the draft. The money is loaned on that bill of lading for the draft drawn for the cotton or grain. That is the company’s business, for cotton in transit. For this cotton and grain that the company advance on the company takes the Bill of lading first, then witness buys a foreign draft; the railroad *1323 bills of lading are exchanged for the ship’s bill of lading; they simply purchase the bills of lading.
As to other advances that the company makes it takes documents such as the two marked “0-1” and “0-2”, offered in evidence, different in different cases.
Supposing the company to loan ten thousand dollars to a man in the country, witness takes the receipt for the cotton where it is to be shipped in a few days, and where the cotton is not to be shipped in a few days, he takes the note, a note like the one marked “C-l”.
The notes are not sent to Paris. Witness keeps them on- trust; they are not negotiable; they are kept in trust for the account and benefit of the Comptoir in Paris. Witness is simply a clerk, and has no individual interest in the business. The company has no capital in Louisiana.
Being asked whether he could tell what monies he had at any time in the handling of his business and wants, he answered “that the balances were returned to Berlin, London and New Tork, from there.” Being asked how he got it, he answered: “By drawing according to credits — the Comptoir had arrangements for it”.
He further testified that the average amount of money he had in bank, year in and year out, was twenty thousand) dollars; that the company had been doing this business in Louisiana since 1895, that the highest assessment which had been placed upon it by the Board of Assessors prior to 1899, upon the company’s “money in possession in bank, etc.,” was twenty thousand dollars altogether; they raised in 1898 to. fifty thousand dollars.
The company had no more money in 1898 than before. At the time the present assessment was made in March, 1898, the company did not have more than $20,000. The company made a verified application for reduction of assessment.
The company never loaned money on due bills, to cotton factors, it loaned money to factors on cotton, not due bills, on cotton in presses. Witness supposed all the cotton was exported. The factors, in many instances, came back, paid the loans and took back the cotton receipts.
The company had loaned money on domestic products not exported from the city, and things of that kind; people had borrowed money in Louisiana and paid it back without any foreign exchange appearing in the transaction, but not frequently.
*1324 Being asked on cross-examination, whether the company’s entire business was confined to foreign bills of exchange, witness answered “that everything was foreign exchange with him”. Being' asked “whether there was any foreign exchange in loaning to cotton men?” he answered: “Yes, when he got the money from Paris.”
Witness stated the company loaned money to people in Louisiana and they paid it back there; they gave the company an obligation to show that they owed the company that money; as a rule the company collected it when it was due (the note), witness was agent for the company with full power of attorney, to represent it; he was no more than a mere clerk, he could draw more than twenty million if he chose. If a person wanted ten or twenty thousand dollars he did not send the papers to Paris to find out whether he could make the loan. He had no discretion, the company wrote to him what to do. The company loaned money on sugar. If a man went to him with a warehouse receipt for one thousand hogsheads of sugar and wanted to borrow $20,-000 on it, he could lend it without writing to Paris, if the house was good and according to the instructions he had received beforehand.
If his instruction from Parish should say he could loan on sugar andi cotton and grain, he -would loan the money if he thought the collateral was good.
He did not know whether the sugar was exported. The parties would come in, pay their loan and take the receipt away, and pending that time witness held the receipt, and the note. The company did the same thing with cotton and grain. A great deal of the company’s business was done in that way.
In addition to this, witness bought bills of exchange on London and Paris and other places, to which are attached bills of lading; that was a large part of the company’s business.
The company did not handle commercial paflper, it did not make any local discounts. It.had loaned money on State or city bonds, but very seldom. Sometimes the cotton people got rid of their cotton and wanted some money to advance to the interior, and they replaced their cotton by bonds, but very seldom; it had never advanced to the banks in New Orleans; it had never loaned on United States bonds, but would do so willingly.
When money was loaned, secured by collateral bonds, witness would keep the securities and the notes attached in Louisiana; he would kceip *1325 them himself for the Comptoir; the notes were kept here, not sent to Paris.
When loans were made he reported them to Paris; he would not report them after they had been paid back. He did not, in making loans, fix any rates of discount or rate of interest; he did not discount.
The company knew of the loans ten days after they were made; the money was often paid back before the mail reached Paris.
Witness drew bills of exchange on Paris for the funds he required here; he deposited in New York as a rule; he kept some money to his credit in bank in New Orleans; an average of about twenty thousand dollars;-he could obtain a loan if he wanted it; witness meant that if all his outstanding checks were paid, there would only be twenty thousand dollars to his credit in bank.
His cheeks on the New Orleans banks amounted in the course of a year in the millions. There was this average of twenty thousand dollars without reference to any special time; very often he was overdrawn. The $20,000 was about the average balance he carried in bank, after deducting the checks that were outstanding.
The company loaned money on cotton, sugar and grain, on warehouse receipts and bills of lading; it loaned money also on city and State and United States bonds. Witness knew of no other character of loans on which it advanced money; it did not lend money to planters or refiners or manufacturers; or loan on mortgage or vendor’s liens. The average balance in bank, kept in bank, was $20,000, but the deposits in the year ran up in the million.
Witness stated that on one occasion he had loaned to Mr. Nieholls on collaterals, premium bonds and State bonds, different collaterals, that the company would not loan on goods, ware and merchandise; that he would not loan on them but that he would sometimes accept them against a credit because sometimes a client wished to make the exchange of a collateral; he would allow a substitution of merchandize for bonds, but only for the time being so as to enable parties to handle their goods.
The company was not carrying on a general loan business; three-fourths of the business was cotton and grain; the company was not carrying on a general’ loan business outside of the foreign exchange business; the whole thing was a foreign exchange business and there was nothing of that kind in the company’s books-
*1326 The following questions were asked by the State and answered by the witness:
“Q. — You say that the foreign exchange business is when a person comes with warehouse receipts for sugar or anything else, that not having more than twenty thousand dollars, in case you desire more you draw a bill of exchange on Paris or London or New York?
“A. — Yes, sir.
“Q. — And thereupon you take the obligation of this person together with his security, and you keep them here in your own vault?
“A. — Yes, sir.
“Q. — It is paid here?
“A. — Yes, sir.
“Q. — And if it is not, you take the collateral ?
“A. — Yes, sir.
“Q. — That is what you call it?
“A. — Yes, sir.
“Q. — You don’t refer the matter to Paris?
“A. — Oh, yes.
“Q. — If you haven’t got the money here you draw a bill of exchange on Paris?
“A. — Yes, Paris- — -Berlin, maybe New York — any place.
“Q. — You get this bill of exchange cashed here?
“A. — No, not here, but in New York, as a rule, for I buy exchange there.
“Q. — And you take this money and you loan it out?
“A. — Yes, sometimes I loan it, and sometimes the clients draw it themselves. [7
“Q. — In other words then, all the foreign exchange has to do with this portion of the business, is that you get the money through bills of exchange ?
“A. — Foreign exchange — I get the money through foreign exchange. Yes, sir; I get it through foreign exchange.
By the court:
“Q. — In loans of that sort when you hold documents such as 0-1 and 0-2, do they as a rule average more than fifty thousand dollars ?
“A. — No, sir; not at one time.
“Q. — Have you any idea of what they average the year through?
“A. — A big amount.
*1327 “Q. — I mean the amount on this kind of note and this sort of contract that you have on hand at any one time; are they as much as $50>000 on an average? . ■
“A. — Yes, sir; and more sometimes.
By Mr. Hall (plaintiff’s counsel) :
“Q. — I understood you to say that the Comptoir keeps no money here for the purposes of this exchange business, but that when you make a loan you draw on Berlin and Paris or whichever is most available and you sell that exchange to a bank or cash the exchange here, or in New York as the case may be, and that money is immediately paid on that loan and therefore there is no need of keeping a bank account of any large sum?
“A. — Yes, sir; that is right.
“Q. — And when that money is loaned on foreign bills of exchange or bills of lading, they are sent to Paris immediately?
“A. — -Yes, sir; and different places by the first mail.
Admission.
It is admitted that the undisputed part of this tax for the year 1898 has been paid without prejudice to the rights of any party to the suit, and the receipt of the city for the sum of $414, being taxes upon $20,000 money in possession, and that the offer was made to pay on the same tax to the State tax collector and it was refused.”
By Mr. McLoughlin (Assistant City Attorney):
“Q. — The question that was asked you and the answer you gave in reference to bills of exchange only refers to the bills of exchange you purchased here?
“A. — Yes, sir.
“Q. — You buy bills of exchange outright?
“A. — Yes, sir; through the bills of exchange I send the money back from where I borrow it.
“Q. — You buy bills of exchange outright?
“A. — Yes, sir.
“Q. — You don’t mean you loan money on bills of exchange on Europe in New Orleans.
“A. — No, sir.
“Q. — You don’t loan money on bills of exchange?
“A. — No, sir; if it is not in proper form or the goods are subject to depreciation, I may loan part of it.”
*1328 Opinion.
We were told from the bar that the only question submitted to us for decision is, whether the non-negotiable notes taken and held by the plaintiff under the circumstances disclosed by the evidence, are liable to taxation-; that should the court be of the opinion that they are taxable, the amount claimed from the plaintiff on that item is correct.
. Plaintiff’s contentions are summarized in the syllabus of his brief, as follows:'
“Plaintiff is a French corporation domiciled in Paris, France. It is engaged in the transaction of an exchange and brokerage business in the city of New Orleans, being here represented by an agent.
“It loans money, upon bills of lading covering cotton and grain sent from interior points of Louisiana and neighboring States, to Galveston, New Orleans and Mobile, for shipment to Europe.
“And sometimes it loans money on warehouse receipts of such agricultural products, while stored preparatory for shipment.
2
“All the money which it lends is raised by selling its drafts of exchange to New Orleans banks, such bills of exchange being drawn upon Paris, London, Berlin, or New York, wherever most advantageous, and ihe money thus borrowed from the banks is paid by plaintiff to the holders of the cotton or grain in question.
3
“To meet these drafts of exchange, while the cotton and grain is on its way to Europe, plaintiff buys drafts of exchange on the foreign market upon which its original draft was drawn, and with the proceeds of said purchased drafts of exchange meets its own drafts.
4
“In the few instances when this course ia not pursued, plaintiff raises money by drawing a draft of exchange on itself in Paris, and has the same 'cashed by local banks. It has no funds nor capital of any kind in the city of New Orleans, except an average fluctuating balance *1329 growing out of these transactions, which in no case and at no times, exceeds $20,000, and upon this $20,0000 it pays'taxes as upon money in hand.
5
“Plaintiff', therefore, for all funds which it utilizes in this city and the adjacent States, is primarily a borrower from local banks, and ultimately, it repays its loans with money raised in Europe or New York.
6
“For the moneys loaned in this way it receives non-negotiable promissory notes of hand, made payable to it, and not to order. It has been assessed for the first time in 1898, upon these notes as upon ‘credits’. Such assessment and the consequent tax are illegal, because such credits are incorporeal and intangible, and can have no independent situs of their own; but necessarily follow and attach to the domicile of the foreign plaintiff in France.
7
Intangible property has no actual situs. If a credit for the purpose of taxation be assigned a situs, it must be the place where it is owned, not the place where it is owed. To make it follow the debtor instead of the creditor is to tax property instead of wealth. 25 Ohio State, 1; 3 Oregon, 13; 2 Oregon, 327; 16 Cal. 167; 23 Cal. 138; 3 McCord, 378; 50 Ga., 387; 33 Ga., 113; 23 Ga., 566; 3 Colorado, 349; 96 U. S., 445; 9 Wheaton, 907; 15 Wallace, 320; 19 Md., 22; 29 Md., 49; 7 Ohio, 52; 10 Allen, 101; 28 Vermont, 188; 42 Conn., 426; 25 Cal., 602; 38 Cal., 466; 2 Butcher, 184; 4 Woods, 207; 12 Iowa, 539; 22 Fed. Rep., 602; 11 Ann., 268-282; 38 Cal., 461; 35 Cal., 282; 29 Cal., 533; 25 Cal., 603; 39 Conn., 176; 25 N. J., 531; 26 N. J., 564; 54 Iowa, 57; 96 U. S., 432; Cooley on Taxation, 1; 15 Wallace, 319; Cooley on Taxation, 21; 52 Conn., 26; 426 Ohio, 1; 101 U. S., 499; 27 Grattan, 354; 173 U. S., 203; 15 Wallace, 323.
8
“As held in 15 Wallace, 323, the true test of the taxability 'of a credit- held by a non-resident is:
*1330 “ ‘Does such credit, by general usage, acquire the character of, and is it treated as property, and does it pass as money wherever it may be?’
“State and municipal bonds have this character, and so, possibly, checks upon solvent banks.
9
“Act 98 of 1886, p. 134.
“Act 85 of 1888, p. 111.
“Act 106 of 1890, p. 121, and.
“Act 170 of 1898, only provide for -the taxation of property ‘situated within the State of Louisiana.’ ”
And the Legislature has not attempted, by any enactment, to localize credits, held by non-residents, the act simply providing that all credits shall be taxed; that provision being limited by the general statement, in all the revenue acts, that only property in the State of Louisiana is liable to taxation.” '
The evidence establishes that the plaintiff corporation is pursuing in the city of New Orleans a continuing business through an agency there; that it loans money upon collaterals of various kinds for which the borrower gives the compjany his non-negotiable promissory notes.
'These notes received by the agent are kept by him, until maturity, wi en they are either taken up by payment in money by the debtor or through exhaustion of the collateral.
I he monies so received are reinvested in other loans.
It is claimed that the plaintiff never sends its own monies into this State and there lends them, but that the monies loaned are obtained through foreign drafts or bills of exchange.
We think the particular manner or instrumentality by which the monies usdd by plaintiff in the course' of its continuing business in Louisiana is obtained is a matter of no moment or significance in the consideration of the question which we are now dealing with.
It, beyond question, loaned monies in Louisiana which for the purposes of the loans were the company’s monies, and the borrowers give ' the company their own non-negotiable promissory notes to represent money received from the company. The notes represent ah equivalent amount of money of the-company in Louisiana.
Plaintiff claims that these non-negotiable notes are to be considered as being constructively in France, the domicil of the plaintiff com *1331 pany; that a promissory note follows as much the domicil of the cred'itor as does an open account. That the rule mobilia sequuntur personam applies to them and they are no more taxable than if they were in fact in the vault of the company in Paris. This rule in its application to the subject of taxation has been recently exhaustively considered by the Supreme Court of the United States in the ease of City of New Orleans vs. Stempel, Guardian, in which our own decisions as well as those of others were collated.
The syllabus of that decision declares that notes and mortgages, the owner of which is domiciled in another State, when they are kept within the State by an agent, may be subjected to taxation by the law of the State in which they are held”.
A non-negotiable note is certainly sufficiently concrete in form to be made an object of taxation. The fact that it may be less valuable in fact than it appears on its face, may affect the estimate to be placed upon it for assessment purposes, but that question is something other than the question of its being a proper object of taxation.
If a person domiciled abroad were to die leaving non-negotiable notes in this State in the hands of an agent, the presence of these notes in Louisiana would authorize the opening of the succession in Louisiana for the protection of Louisiana creditors.
We think the State has as much legal right to subject them being here to the payment of the contribution which it justly claims from all parties receiving the protection and benefit of its laws, who operate their property here for their individual gain and benefit, as any creditor would have.
The rule mobilia sequuntur personam is subject to numerous exceptions. Thus, in Prance, it has been held that “les prelevements accordes aux heritiers Franeais sur les biens sitúes en France comme indemnite des exclusions resultant de la loi etrangere peuvent etre exerces meme sur les valeurs payable par des banques etrangeres quand les titres soit nominatifs soit au porteur ont ete laisses en France par l’auteur eommun”. (Civ. C. 27, Auot. 1850.)
We think the facts of this .ease bring it squarely under the decisions in Bluefield Banana Company vs. Board of Assessors and City of New Orleans, 49 Annual, 43, and Parker vs. Strauss, 49 Annual, 1173.
In the former case this court referring to the corporation claimino; exemption said:
*1332 “The foreign corporation had an agent here, where it received and where it sold fruit and received the price for the same. Part of the proceeds were withheld in the hands of the agents for purposes incidental to the prosecution of its business, and part.deposited to the credit of the company, subject to the' check of its local agent. Also for the prosecution of its business here, and for such other purposes as the company might direct it to be applied to. The company transacted business in New Orleans precisely as did resident business men and firms. It received all the advantages to be derived from the State and city governments which residents received, and we see no reason why it should not be taxed, as claimed in this proceeding, unless there be insuperable legal objections in the way. We find a statute of the State, which by its terms brings them under the operation of State and city taxation, and we are bound to give effect to its provisions unless they be in derogation of the Oonstitution. The uneonstitutionality of the Act is not pleaded, and we of ourselves, see >10 unconstitutional features in it. The rule mobilia sequuniur personam is a fiction of law, not resting of itself upon any constitutional foundation, and which gives way before express laws, destroying it in any given case, where constitutional requirements themselves do not stand in the way.
There is no parelellism between this case and that of Clason & Company vs. The City of New Orleans, 46 A., 1.
The facts of the case are entirely different. Here the foreign corporation is engaged in a regular ■ business investing and re-investing the monies through an agent in this State.
In the other case, Clason & Co. were merely the agents of an English firm for the purchase of cotton to be shipped by them at once to the firm in Europe.
Instead of paying for this cotton by means of bills of- exchange transferred to the vendors which they themselves would have cashed, the agents, for convenience, had the bills cashed, deposited the amount in bank and drew against the funds in favor of the sellers.
For the reasons assigned it is hereby ordered, adjudged and decreed that the judgment appealed from be and it is hereby affirmed.
Rehearing refused.