TRICE et al. v. COMSTOCK et al.

(Circuit Court, W. D. Missouri, W. D. May 5, 1902.)

1. VENDOR AND PURCHASER—INNOCENT PURCHASER—ASSIGNEE OF EXECUTORY CONTRACT.

An assignee of an executory contract, giving an option to purchase lands, does not occupy the position of an innocent purchaser, but takes only the rights of his assignor, either as against the vendor or third parties.

2. EQUITY—RIGHT TO RELIEF—CLAIM ARISING OUT OF FRAUDULENT CONTRACT.

Complainants falsely assumed to be agents for the owner of a tract of land, and to have authority to sell the same for a certain price per acre. Their scheme was to sell the land secretly for a greater price, pay the owner the price demanded by him, and retain the excess. In this scheme they associated one of defendants with them to assist in making the sale. Such defendant procured an option from the owner for the purchase of the land himself, and assigned the same to his co-defendant, who made the purchase. Held, that complainants' scheme was in fraud of the rights of the owner of the land, whom they assumed to represent as agents, and they had no standing in equity to maintain a suit to require an accounting from defendants of the profits realized from the lands, on the assumption that a trust relation existed between the parties.

In Equity. On final hearing.

Thurman, Wray & Timmonds and Robinson, Bowling & McCluer, for complainants.

John C. Tarsney, for respondents.

McPHERSON, District Judge. This is an action by a bill in equity to enforce an alleged resultant trust. The complainants are a firm dealing in real estate, residing at Lamar, Barton county, Mo. Respondents are brothers, residing in a small town near Clinton, Iowa. W. C. Comstock is a banker and dealer in real estate. James C. Comstock has been a merchant. H. B. Buckwalter, now deceased, late of Westchester, Pa., owned a body of 1,920 acres of land in Barton county, Mo., the larger part or all improved. George E. Bowling, an attorney at law and real estate agent, of Lamar, Mo., up to the death of Buckwalter, in 1897, and for many years prior thereto, was Buckwalter's agent for renting and caring for the lands, but without authority to sell. Buckwalter left a last will and testament, by the terms of which these lands were devised to a Mr. Reid as executor, and a lady as executrix, with power to sell and convey these lands. The lady had nothing to do with the matters and things hereinafter recited, refusing, when requested, to recognize any of the parties. The business on the part of the estate was conducted by Mr. Reid. His conduct is in no way challenged, and it is sufficient, and likewise proper, once and for all, to say that he is a lawyer of ability, and a gentleman of high character and integrity. After Mr. Reid became the executor he concluded it the better to sell these lands. He went to Barton county, Mo., viewed the lands, and sought information of their value. This was in 1897. He had much talk with Bowling, as well as subsequent correspondence. There is evidence on the question, and much said in argument, and mostly pertinent, as to

the character of the transactions of Bowling, the complainants, and the two defendants, from the first to the end of the matters under consideration; and it is proper to say that the complainants, and Bowling included, and the respondent W. C. Comstock, were all keen, shrewd speculators, and manipulators and promoters, doing things by short turns, and by methods that seem novel. The lands in question were attractive and cheap.

The complainants, in carrying on their real estate business of Lamar, did what they called "immigration" business. They sought to influence people from Iowa, Illinois, and other states to buy lands, and locate in Barton county. But their real purpose was the making of money for themselves on so-called "commissions" or "differences." It seems that they would not sell lands on regular or fixed commission. Their method was to obtain an option from the landowner on the lands at a fixed price net to the owner, they to have all they could get over the price thus fixed. By so doing they were not obligated in any way, but the landowner was tied up. They claim to have had such arrangement as to the Buckwalter estate lands of 1,920 acres. This is one of the disputed questions of the case. That they had no such arrangement directly with Buckwalter or his executor is not disputed; and there is not even a pretense that the lady who was executrix, directly or indirectly, gave any authority to sell the lands at any price, or any terms, to any person. If they did have such arrangement, it was only with Bowling, the rental agent, but who claims to have received from Reid, the executor, the additional authority to sell. This Reid denies.

A man by the name of Reitmeyer, of northeastern Iowa, an insurance agent, promoter, and dealer, by most peculiar and tortuous methods, in most anything, gets into correspondence with complainants on the subject of "immigration" into Barton county. He was to induce men to visit Barton county to look at lands, the expenses of himself and prospective purchasers for the trip to be paid by complainants, on receipts taken according to prescribed forms from certain railroads, for the evident purpose of enabling complainants to be reimbursed from the railway companies in whole or in part. Reitmeyer asked complainants, which request was granted, to have the respondent W. C. Comstock act with him, as a kind of or semi partner, in taking persons to Barton county, and receive a part of the contingent commission to be received by complainants, being the excess received by them over and above the net price fixed by the owner. And W. C. Comstock and Reitmeyer, in this "immigration" business, took one or more persons to Barton county, and a part of the expense was paid by complainants,—something like $70. How much complainants are out, if any sum, the evidence does not show.

Complainants make two claims: First, that they were the agents, duly authorized by the Buckwalter estate, to sell the lands. But I find that they had no such authority. Much is said by counsel on both sides as to the statute of frauds. In my judgment, that question is not entitled to consideration, for the reason it has no application. Bowling says he had the authority from Mr. Reid, the executor, to employ the complainants. This Reid denies, and the correspondence from Bowling absolutely destroys his evidence.

Complainants' other claim is that, if they did not have the authority to sell the lands, they assumed to have the authority, and that, as between them and defendant W. C. Comstock, this was sufficient. The testimony fairly shows the following as the facts: In 1897, and after Mr. Buckwalter's death, Mr. Reid, the executor, came West to look over these lands. Mr. Bowling had been the agent for renting and paying taxes and for nothing else. Reid had Bowling go over the lands with him. Conversations occurred as to the value of these lands and prospective sales in the county generally. Bowling wanted and asked authority to sell, but never received it. Subsequently he asked for such authority by letter. But he never received it. The authority assumed by both Bowling and by complainants was neither definite nor certain in any one particular excepting the price per acre. The assumed authority was to sell to any one, solvent or insolvent; no question of security, other than by inference, of mortgage; and no question of whether the sale was to be for cash, or part cash and part on time; if partly on time, then what time, or what rate of interest. None of these important matters to Mr. Reid were ever assumed. But in thus assuming complainants were to occupy the following position: Reid was to have $20 per acre. Although a principal ordinarily expects only the sum for which he agrees to sell, yet if the agent sells for more it inures to the benefit of the principal. No principle of the liability of an agent, or of the relations between principal and agent, is better understood than this. A great deal has been said and written by counsel in this case, all of which I indorse, as to the relations and duties and obligations of an agent to his principal. But the complainants' position in this case is that in fact they were not the agents; that by assuming the agency they would not sell at the price demanded by the owner, because then they would get no commission, but that they would secretly sell for a greater price, maintain such price as a secret, pay over the $20 per acre to Reid, and pocket the balance! Having no authority in fact to act as agents, but only assuming it, such, as above stated, is necessarily their position. And in carrying out that kind of a scheme, calling Reitmeyer and W. C. Comstock to their aid, then, because it failed, they insist that a court of equity should give them relief as against W. C. Comstock, because he (W. C. Comstock) was not loyal to the scheme,—a scheme which, in my judgment, was against equity, morals, and conscience. Possibly, and it is only possible, that if Reid, as executor, carrying out his trust, subject to the approval of a court of probate, had said that he wanted $20 per acre for the land, and that as a commission he would allow all in excess of $20 per acre, that if complainants had sold the land for what they say it was worth, $30 per acre, complainants could have $19,000 as their commission. Be that as it may, we do not have that case to deal with. Because Reid demanded $20 per acre, complainants, without right, assumed that they could make such a deal, and because one of their agencies played traitor to them they should be given relief as against him. I cannot allow that.

That the Buckwalter estate was wronged, I have no doubt. But I do not believe that this court should by decree in this case, between these parties, give direction as to the spoils. I agree that an agent must be loyal to his principal; that he must use skill and diligence and

zeal for his principal; the information acquired by an agent belongs to his principal; that the use of information acquired by an agent, when an agent, can only be used by the agent, whether during or after the agency, for the benefit of the principal. These things are not only in harmony with good morals, but they are exacted and enforced by the courts. But I am not able to see what application they have to this case. If W. C. Comstock was lacking in good faith towards complainants, the answer is that complainants were not in a position to ask for good faith in the matter of the Buckwalter lands. W. C. Comstock took a contract or option for these lands from Reid, the executor. He assigned this contract to his brother, a defendant herein, James C. Comstock. Whether he did this as a matter of stupidity, or in fraud, or for value and in good faith, I do not deem it material to decide, and do not think it necessary to either review the evidence or follow the arguments of counsel. The fact not in dispute is that James C. Comstock took the place of his brother, W. C. Comstock, by assignment of the executory contract between Reid and W. C. Comstock. This was no better than taking by a quitclaim deed; and such a position is not and cannot be that of an innocent purchaser. May v. Le Claire, 11 Wall. 217, 232, 20 L. Ed. 50; Baker v. Humphrey, 101 U. S. 494, 499, 25 L. Ed. 1065; Dickerson v. Colgrove, 100 U. S. 578, 584, 25 L. Ed. 618. While the appellate courts of a few states hold otherwise, yet the above is supported by the great weight of authority; and if it be a rule of property, and is governed by the laws of Missouri, my attention has not been directed to any case of the state holding to the contrary. Therefore this case should be and is decided as though W. C. Comstock alone is defendant, and as though no assignment of the contract had been made by W. C. to James C. Comstock.

Before receiving a deed from Reid, James C. Comstock knew all or practically all of the claims asserted by complainants. There are a great many things in the evidence in this case which persuade me that it was the united purpose of complainants and Bowling, W. C. Comstock, and Reitmeyer to get the lands held in trust by Reid for the Pennsylvania estate, beat the price down, and make and divide, in secret, an unfair and extortionate commission; and, this being the fact, I know of no reason why this court should aid one of the parties as against another.

But there is another view of the case which prevents a recovery by complainants. W. C. Comstock was at no time the agent of complainants to buy the land from Reid. All that can possibly be claimed is that he was an agent to assist in selling the lands to some unknown third party at a price in excess of $20 per acre, the sum demanded by Reid. Complainants had no rights to ownership nor interest in the lands. All they claimed, and all they assumed,—and that was without merit,—was the contingent right to share in the profits when the land was sold to such party on such terms and at a price as would be approved by Reid; and that, in my judgment, was not the creation of a trust relation between complainants and W. C. Comstock. The parties should all be left where the court finds them.

Complainants' bill in equity will be dismissed, at their costs.