## BAKER *v.* HUMPHREY.

1. A. conveyed premises in 1851 to B., and took from him a mortgage for the purchase-money. Both deeds were recorded. B. never took possession. A., by an instrument recorded March 19, 1852, assigned the mortgage to C., who conveyed the premises with warranty to D., under whom complainant claims title. B. lived near the premises for years, and knew that C. and others were in adverse possession claiming title, but never claimed or intimated that he had himself any title. B. drew the conveyance of C. to D., and as a notary public took C.'s acknowledgment thereto, and was silent as to any defect in the title. B. executed a quitclaim deed of the premises in 1872 to a stranger. *Held,* that the facts made a complete case of *estoppel in pais,* and that nothing passed by B.'s deed.

2. An attorney employed by both parties to an agreement for the purchase of land for the sum of $8,000, upon discovering a defect in the title, concealed the fact from one of the parties, and in accordance with a secret agreement with the other procured a conveyance by quitclaim for the sum of $25 to E., his own brother. *Held,* that his conduct was a gross breach of professional duty, and that E. should be decreed on receiving the purchase-money, $25, to convey to the injured party the premises, with covenant against the title of E. and all others claiming under him.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

This was a bill filed by Sandford Baker against George P. Humphrey, Hiram D. Hurd, Charles A. Hurd, and David Smith, to have the ostensible legal title to certain premises which had vested in Humphrey by one Chapman declared to have been fraudulently obtained, and that Humphrey be adjudged to convey the premises to the complainant. The bill was heard upon the pleadings and proofs, and dismissed. Baker appealed here.

The facts are fully stated in the opinion of the court.

*Mr. Theodore Romeyn* for the appellant.

*Mr. George W. Dyer* and *Mr John Atkinson, contra.*

Mr. JUSTICE SWAYNE delivered the opinion of the court.

This is an appeal in equity. A brief statement of the case, as made by the bill, will be sufficient for the purposes of this opinion.

On the 27th of February, 1851, one William Scott conveyed the premises in controversy to Bela Chapman, taking from him a mortgage for the amount of the purchase-money, which was $3,500.

Both the deed and mortgage were properly recorded. Chapman did not take possession of the premises. On the 29th of November, 1851, Scott assigned the mortgage to Jacob Sammons.

The assignment was duly recorded on the 19th of March, 1852. Sammons conveyed the premises with warranty to William M. Belote. From him there is a regular sequence of conveyances down to the complainant, Baker. Chapman lived near the property for years, and knew that Sammons and others were in adverse possession and claimed title, but never claimed or intimated that he had any title himself. He drew deeds of warranty and quit-claim of the premises from others claiming under Scott, and, as a justice of the peace or notary-public, took the acknowledgment of such deeds. Upon these occasions also he was silent as to any defect in the title.

The complainant entered into a contract with the defendants Hurd & Smith to sell and convey the premises to them for the sum of $8,000.

He employed Wells S. Humphrey, a reputable attorney, who, for a long time, had been employed by the complainant when he had any legal business to do, to draw the contract. Humphrey accordingly drew the agreement and witnessed its execution. Hurd & Smith thereupon took possession and held it when the bill was filed. They employed Humphrey to procure an abstract of title. In examining the title he found there was no deed from Chapman.

He thereupon sought out Chapman, and by representing to him that the object was to protect the title of clients, procured Chapman to execute a quit-claim deed of the premises to George P. Humphrey, the brother of the attorney, for the sum of $25. The deed bears date the 10th of June, 1872. George

knew nothing of the transaction until some time afterwards. An action of ejectment was instituted in his name to recover the property. Baker tendered to him $25, the amount he had paid for the deed; offered to pay any expenses incurred in his procuring it, and demanded a release. He declined to accept or convey.

The prayer of the bill is that the deed to George P. Humphrey be decreed to be fraudulent, and to stand for the benefit of the complainant; that the grantee be directed to convey to Baker, upon such terms as may be deemed equitable, and for general relief.

Such is the complainant's case, according to the averments of the bill.

The testimony leaves no room for doubt as to the material facts of the case.

The direction for drawing the contract between Hurd & Smith and Baker, was given to the attorney by Robling, the agent of Baker. Baker resided in Canada. Hurd & Smith directed the attorney to procure the abstract of title. With this Baker and Robling had nothing to do. The attorney disclosed the state of the title to Hurd & Smith, but carefully concealed it from Robling. Hurd & Smith being assured by the attorney that whatever they might pay Baker could be recovered back if his title failed, executed the contract with Baker, and declined to buy the Chapman title, but gave the attorney their permission to buy it for himself. There is evidence in the record tending strongly to show that there was a secret agreement between them and the attorney, that if the Chapman title were sustained they should have the property for $5,000, which was $3,000 less than they had agreed to pay Baker. This would effect to them a saving of $3,000 in the cost. They refused to file this bill, and declined to have anything to do with the litigation. It thus appears that, though unwilling to join in the battle, they were willing to share in the spoils with the adversary if the victory should be on that side.

There is in the record a bill for professional services rendered by the attorney against Baker. It contains a charge of $2 for drawing the contract with Hurd & Smith. The aggregate

amount of the bill is $43.    The first item is dated July 5, 1871, and the last July 12, 1872.    The latter is the charge for drawing the contract.    There is also a like bill against Baker and Smith of $45, and one against Baker and Mears of $6.    These accounts throw light on the relation of client and counsel as it subsisted between the attorney and Baker.

With respect to Chapman we shall let the record speak for itself.    Vincent testifies: " I asked him, How is it, Chapman ? I thought you owned that property " (referring to the premises in controversy).    " He said, ' No; I never paid anything on it.' He said, ' Sammons has a right to rent.    It is his property.' . . . ' I asked him how he came with the deed from Scott, and he said, ' It was only to shield Sammons; that afterwards Michael Dansmon paid the debt and the property went back to Sammons.' . . . ' When I met Bela Chapman, and he asked for Sammons and wife, he said he had drawn a deed from Sammons and wife to Belote for the premises, and wanted them to sign it.' "

Francis Sammons, a son of Sammons, the grantor to Belote, says: " A part of a house situated on that lot three was leased by my father to Bela Chapman, in 1851, for the purpose of storing goods, and he afterwards lived in it a while.    I collected the rent.    I think he occupied it with his goods and family about three months.    He never occupied or had possession of the premises at any other time, to my knowledge.    He came from Mackinac when he put the goods in that house.    He remained here four or five years after he came from Mackinac. He lived in Mackinac until his death.    He came over to Cheboygan several times after he went to reside at Mackinac. Sometimes he would stay a week or two, visiting.    At the time he lived here he was a notary-public, justice of the peace, and postmaster.    I know he was in the habit of drawing deeds and mortgages for any one that called on him.    I don't think there was any one else here during the year 1852 and 1853 who drew deeds and mortgages but Bela Chapman in this village. My father sold the premises to William S. M. Belote.    My father was in possession of the premises from 1846 until he sold to Belote."

Medard Metivier says: " I hold the office of county clerk

and register of deeds for Cheboygan County; have held these offices since 1872.' . . . 'I am in my sixtieth year. I came to live in this village in 1851. Lived here ever since, except about six years when I lived in Mackinac and Chicago during the war. I know Jacob Sammons and Bela Chapman; they are both dead. I remember being at the house of Jacob Sammons when a deed was executed by Sammons and wife to Belote. I witnessed the deed. That deed was witnessed by and acknowledged before Bela Chapman, as notary-public. I think there was another deed executed by Sammons and wife to Belote, which I witnessed when Bela Chapman was present. I remember the circumstances distinctly of one deed being executed, witnessed by myself and Chapman, from the fact that the room was very dark, owing to Mrs. Sammons having very sore eyes, and we had to raise the curtain for more light. There was not any other full-grown person there, unless Mr. Belote was there, about which I cannot state positively, than Mr. and Mrs. Sammons, Mr. Chapman, and myself. A part of the deed which I witnessed was in print. It was an old-fashioned form of printed deed. Mr. Chapman brought the form from Mackinac or somewhere. He only had them here. I know the premises described in the bill in this cause, and Chapman was never in possession of them to my knowledge. I know Mr. Chapman's handwriting very well, and I remember particularly that the deeds witnessed by myself and Mr. Chapman and acknowledged before him were in his (Chapman's) handwriting, and that he drew both of them. I know one of the deeds then executed by Sammons and wife to Belote conveyed the premises in question and other property; cannot tell all of the other property."

These witnesses are unimpeached and are to be presumed unimpeachable. Their testimony is conclusive as to Chapmans's relation to the property. If there could be any doubt on the point, it is removed by the fact that for $25 he conveyed property about to be sold and which was sold by Baker to responsible parties for $8,000. This fact alone is decisive as to the character of the transaction with respect to both parties. No honest mind can contemplate for a moment the conduct of the attorney without the strongest sense of disapprobation.

Chapman conveyed by a deed of quit-claim to the attorney's brother. The attorney procured the deed to be so made. It was the same thing in the view of the law as if it had been made to the attorney himself. Neither of them was in any sense a *bona-fide* purchaser. No one taking a quit-claim deed can stand in that relation. *May* v. *Le Claire*, 11 Wall. 217.

There are other obvious considerations which point to the same conclusion as a matter of fact. It is unnecessary to specify them, and we prefer not to do so.

The admission of Chapman while he held the legal title, being contrary to his interest, are competent evidence against him and those claiming under him. He said the object of the conveyance to him was to protect the property against a creditor of Sammons. If such were the fact, the deed was declared void by the statute of Michigan against fraudulent conveyances (2 Comp. Laws of Mich. 146); and it was made so by the common law. The aid of the statute was not necessary to this result. *Clements* v. *Moore*, 6 Wall. 299. Nothing, therefore, passed by the deed to Chapman's grantee.

Chapman's connection with the deed from Sammons to Belote would bar him, if living, from setting up any claim at law or in equity to the premises. The facts make a complete case of *estoppel in pais*. This subject was fully examined in *Dickerson* v. *Colgrove*, 100 U. S. 578. We need not go over the same ground again. See, also, *City of Cincinnati* v. *the Lessee of White*, 6 Pet. 431; *Doe* v. *Rosser*, 3 East, 15; and *Brown* v. *Wheeler*, 17 Conn. 353.

If Chapman had nothing to convey, his grantee could take nothing by the deed.

The latter is in exactly the situation the former would occupy if he were living and were a party to this litigation. The estoppel was conclusive in favor of Belote and those claiming under him, and this complainant has a right to insist upon it.

But there is another and a higher ground upon which our judgment may be rested.

The relation of client and counsel subsisted between the attorney and Baker. The employment to draw the contract with Hurds & Smith was not a solitary instance of professional

service which the latter was · called upon to render to the former. The bills of the attorney found in the record show the duration of the connection and the extent and variety of the items charged and paid for. They indicate a continuous understanding and consequent employment. Undoubtedly either party had the right to terminate the connection at any time; and if it were done, the other would have had no right to complain. But, until this occurred, the confidence manifested by the client give him the right to expect a corresponding return of zeal, diligence, and good faith on the part of the attorney.

The employment to draw the contract was sufficient alone to put the parties in this relation to each other. *Galbraith* v. *Elder*, 8 Watts, (Pa.) 81; *Smith* v. *Brotherline*, 62 Pa. St. 461. But whether the relation subsisted previously or was created only for the purpose of the particular transaction in question, it carried with it the same consequences. *Williamson* v. *Moriarty*, 19 Weekly Reporter, 818.

It is the duty of an attorney to advise the client promptly whenever he has any information to give which it is important the client should receive. *Hoops* v. *Burnett*, 26 Miss. 428; *Jett* v. *Hempstead*, 25 Ark. 462; *Fox* v. *Cooper*, 2 Q. B. 827.

In *Taylor* v. *Blacklow* (3 Bing. N. C. 235) an attorney employed to raise money on a mortgage learned the existence of certain defects in his client's title and disclosed them to another person. As a consequence his client was subjected to litigation and otherwise injured. It was held that an action would lie against the attorney and that the client was entitled to recover.

In Com. Dig. tit. "Action upon the case for a Deceit, A. 5," it is said that such an action lies " if a man, being entrusted in his profession, deceive him who entrusted him; as if a man retained of counsel became afterwards of counsel with the other party in the same cause, or discover the evidence or secrets of the cause. So if an attorney act deceptive to the prejudice of his client, as if by collusion with the demandant he make default in a real action whereby the land is lost."

It has been held that if counsel be retained to defend a particular title to real estate he can never thereafter, unless his

client consent, buy the opposing title without holding it in trust for those then having the title he was employed to sustain. *Henry* v. *Raiman*, 25 Pa. St. 354. Without expressing any opinion as to the soundness of this case with respect to the extent to which the principle of trusteeship is asserted, it may be laid down as a general rule that an attorney can in no case, without the client's consent, buy and hold otherwise than in trust, any adverse title or interest touching the thing to which his employment relates. He cannot in such a way put himself in an adversary position without this result. The cases to this effect are very numerous and they are all in harmony. We refer to a few of them. *Smith* v. *Brotherline*, 62 Pa. St. 461; *Davis* v. *Smith*, 43 Vt. 269; *Wheeler* v. *Willard*, 44 id. 641; *Giddings* v. *Eastman*, 5 Paige (N. Y.) 561; *Moore et al.* v. *Bracken*, 27 Ill. 23; *Harper* v. *Perry*, 28 Wis. 57; *Hockenbury* v. *Carlisle*, 5 Watts and S. (Pa.) 348; *Hobedy* v. *Peters*, 6 Jurist, pt. 1, 1,794; *Jett* v. *Hempstead*, 25 Ark. 462; *Case* v. *Carroll*, 35 N. Y. 385; *Lewis* v. *Hillman*, 3 H. L. Cas. 607.

The same principle is applied in cases other than those of attorney and client.

Where there are several joint lessees and one of them procures a renewal of the lease to himself; the renewal enures equally to the benefit of all the original lessees. *Burrell* v. *Bull*, 3 Sandf. (N. Y.) Ch. 15.

Where there are two joint devisees and one of them buys up a paramount outstanding title, he holds it in trust for the other to the extent of his interest in the property, the *cestui que* trust refunding his proportion of the purchase-money. *Van Horne* v. *Fonda*, 5 Johns. (N. Y.), Ch. 388.

Where a surety takes up the obligation of himself and principal, he can enforce it only to the extent of wha. he paid and interest. *Reed* v. *Norris*, 2 Myl. & Cr. 361.

Where a lessee had made valuable improvements pursuant to the requirements of his lease, and procured an adverse title intending to hold the premises in his own right, it was held that he was a trustee and entitled only to be paid what the title cost him. *Cleavinger* v. *Reimar*, 3 Watts & S. (Pa.) 486.

The case in hand is peculiarly a fit one for the application of the principle we have been considering. It is always danger-

ous for counsel to undertake to act, in regard to the same thing, for parties whose interests are diverse. Such a case requires care and circumspection on his part. Here there could be no objection, there being no apparent conflict of interests, but upon discovering that the title was,imperfect it was the duty of the attorney promptly to report the result to Baker as well as to Hurds & Smith, and to advise with the former, if it were desired, as to the best mode of curing the defect. Instead of doing this he carefully concealed the facts from Baker, gave Hurds & Smith the choice of buying, and, upon their declining, bought the property for himself, and has since been engaged in a bitter litigation to wrest it from Baker. For his lapse at the outset there might be some excuse, but for his conduct subse-·quently there can be none. Both are condemned alike by sound ethics and the law. They are the same upon the subject. Actual fraud in such cases is not necessary to give the client a right to redress. A breach of duty is " constructive fraud," and is sufficient. Story, Eq. Jur. sects. 258, 311.

The legal profession is found wherever Christian civilization exists. Without·it society could not well go on. But, like all other great instrumentalities, it may be potent for evil as well as for good. Hence the importance of keeping it on the high plane it ought to occupy. Its character depends upon the conduct of its members. They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superadded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients.

We shall discharge that duty in this instance by reversing the decree of the Circuit Court and remanding the case, with directions to enter a decree whereby it shall be required that the complainant, Baker, deposit in the clerk's office for the use

of the defendant, George P. Humphrey, the sum of $25, and that Humphrey thereupon convey to Baker the premises described in the bill, and that the deed contain a covenant against the grantor's own acts and against the demands of all other persons claiming under him; and it is

*So ordered.*