NORFLEET *v.* STEWART.

Opinion delivered October 21, 1929.

164

*Robinson, House & Moses* and *C. W. Norton,* for appellant.

*Coleman & Riddick,* for appellee.

HART, C. J., (after stating the facts). The theory of appellee was that appellant was a member of the firm of Norfleet & Norfleet, who had been employed as attorneys by Pugh in the civil damage suit, and that, under the terms of the employment, the firm would continue to represent the appellee in the damage suit until the case was settled or decided in the Supreme Court of the State of Arkansas.

On the other hand, it was the contention of appellant that he was not a member of the firm of Norfleet & Norfleet, and that it was distinctly agreed that he should receive the sum of $1,000 for his legal services in effecting a compromise and settlement of the judgment against appellee in the damage suit.

Thus it will be seen that the record presents for our consideration the question of whether or not appellant was one of the attorneys for appellee in the damage suit, and, if so, what duties he owed to his client in effecting the settlement. The chancellor made a general finding of fact in favor of appellee, and this included the finding that appellant was a member of the firm of Norfleet & Norfleet, and was one of the attorneys for appellee at the time the compromise and settlement were effected. Appellant admits that his father was to continue as attorney for appellee if the case was carried to the Supreme Court. He denies, however, that he was a member of the firm. •

We are of the opinion that the chancellor was justified in finding him to be a member of the firm of Norfleet & Norfleet. They had a common reception room, and private offices opening into it. Appellant admitted that they were employed in some cases together, and that he did all of his father's typewriting. Their stationery carried the name of Norfleet & Norfleet as a firm, with the names of the individual members on each side of the firm name. Appellant did some work in connection with the trial of the damage suit. He went with the other attorneys in the case to Memphis to see about a continuance of the case. The firm name was signed to the pleadings in the case. Appellant was present for a part of the time at the trial. He was understood to be a member of the firm, and was, on that account, called into conference about preparing the brief, and later acting for appellee in trying to effect a compromise and settlement of the judgment. He accepted the payment of $750 fee in the name of Norfleet & Norfleet as a firm, and carried on all the correspondence about the matter as if he was a member of the firm of Norfleet & Norfleet. Under these circumstances, it was natural for appellee to understand that he was a member of the firm of Norfleet & Norfleet and consequently one of the attorneys in the case. All the attendant facts tended to show that he was a member of the firm, and the chancellor was justified in so finding.

This brings us to a consideration of what were his duties about effecting the settlement and compromise. A fiduciary relation exists between attorney and client, and the confidence which the relationship begets between the parties makes it necessary for the attorney to act in the utmost good faith. He must not only not misrepresent any fact to his client, but there must be an entire absence of concealment or suppression of any facts within his knowledge which might influence the client, and the burden of establishing the fairness of the transaction is upon the attorney. This rule is of universal application, and is recognized by all of the text-writers on the subject.

The question was the subject of a thorough discussion and review of the authorities in the case of *Thweatt* v. *Freeman,* 73 Ark. 575, 84 S. W. 720. The court quoted with approval from other decisions that all transactions between attorney and client, to be upheld in a court of equity, must be in the utmost good faith, and the burden is on the attorney to show not only that no advantage was taken, but that he gave his client all the information and advice about the matter that was necessary to enable the client to act understandingly. In such cases the attorney must show that the transaction was perfectly fair and that it was entered into with such an understanding of the matter as would enable the client to know thoroughly the scope and effect of it. In other words, the attorney must show the transaction to have been the ''pure, voluntary, and well-understood act of the client's mind, otherwise a court of equity will undo it as having been unduly obtained.''

In the earlier case of *Jett* v. *Hempstead,* 25 Ark. 462, this court recognized that it was the duty of an attorney to advise the client promptly whenever he has any information to give which it is important that his client should receive.

The rule is on the ground of public policy, and prevails though the attorney may not intend to deceive, and

acts in good faith. Actual fraud in such cases is not necessary to give the client a right to redress. A breach of duty is constructive fraud, and is sufficient. *Baker* v. *Humphrey,* 101 U. S. 494.

This rule was recognized and applied in *Maloney* v. *Terry,* 70 Ark. 189, 66 S. W. 919, 72 S. W. 570, where it was held that chancery has jurisdiction of a suit by a client to have his attorney declared a trustee, where the attorney, in settling a claim against the client, fraudulently procured and retained a greater sum than was paid to settle the claim, although an action at law for money had and received would also lie.

The reason for the rule is clearly and comprehensively stated in *Baker* v. *Humphrey,* 101 U. S. 494, as follows:

"The legal profession is found wherever Christian civilization exists. Without it, society could not well go on. But, like all other great instrumentalities, it may be potent for evil as well as for good. Hence the importance of keeping it on the high plane it ought to occupy. Its character depends upon the conduct of its members. They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superadded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients."

The instant case calls for an application of the rule. According to the testimony of the appellant himself, he misconceived his duty to his client, and thought he could deal with them at arm's length. He admits that

he was asked what he was going to do with the $1,000, but stated that it would have to be paid to him for his legal services before he would effect the settlement. This condition he had no right to impose. Under the authorities above cited, it was his duty to have effected the settlement without asking or imposing as a condition therefor that he should be paid an additional compensation. It does not make any difference whether he intended to defraud his client or not. Equity treats the case as one of constructive fraud, and it was his duty to have made a full and fair disclosure of everything connected with the settlement to his client, and to advise his client that the settlement could be made without the payment of an additional fee to him. His employment kept him from imposing such a condition to effect the settlement.

In this view of the matter no useful purpose could be served by a further discussion and review of the testimony. We deem it sufficient to say that it becomes our duty, in the application of the well-settled rule on the subject above announced, to declare that the decree of the chancellor was correct, and it will therefore be affirmed.