4-7153                   187 S. W. 2d 877, 188 S. W. 2d 137

Opinion delivered March 19, 1945.

*Ward Martin,* for appellant.

*John M. Lofton, Jr.,* and *Owens, Ehrman & Mc-Haney,* for appellee.

Griffin Smith, Chief Justice. We are asked to reverse the Chancellor's finding that certain writings were not the voluntary acts of appellee; that their terms should not be enforced as contracts because appellee was overreached when his signature was procured in circumstances rendering the transaction unconscionable.

When suit was filed in mid-1942, payments aggregating $3,350 had been made for legal services it is contended had originally been evaluated at $1,000 cash.

The controversy leads back to the act of New York Life Insurance Company in discontinuing disability bene-

fit payments guaranteed to William A. Rolf, auxiliary to his $10,000 life policy of March 2, 1927. Upon proper proof that the insured had become totally and presumptively permanently disabled, the Company would pay $100 per month and waive subsequent policy premiums. If death occurred as a result of an accident the sum payable was $20,000.

In 1935 Rolf became disabled within the meaning of the policy and payments were begun, with waiver of premiums. During the latter part of May of the following year the Company was advised that Rolf had made material misrepresentations in his application for insurance. It was recognized that the contestable period as to death benefits had expired; hence, contention was that disability commitments, having been fraudulently procured, were not binding. The Company returned that portion of the annual premium of $481.90 apportionable to disability and demanded payment of premiums on the life policy proper.

Upon receipt of the Company's letter of August 21, 1936, in which its views and purposes were expressed, Rolf called on Tom Poe at his law office in Little Rock. Appellee testified that Poe agreed to represent him for $1,000 in cash, or in the alternative the fee should be $2,000 payable from half of benefits as recovered.

Appellee admitted that he signed a so-called agreement dated September 2, 1936, by the terms of which Poe was employed ". . . to prosecute the claim for money due by reason of insurance, . . . [Poe's compensation to be] fifty percent of all sums hereafter collected, whether by suit, compromise, or otherwise."

November 27, 1936, New York Life filed suit in the United States District Court at Little Rock for cancellation of the disability contract and the provision relating to accidental death. The Company demanded return of $600 it claimed had been erroneously paid Rolf.

December 14, 1936, Rolf and his wife signed another writing whereby Poe was employed. Mention was made of the Federal Court suit and other matters affecting

Rolf's rights. The attorney's compensation was stipulated to be fifty percent of all sums thereafter collected as disability payments, ". . . and also twenty-five percent out of all sums heretofore collected or otherwise obtained . . . on account of waiver of premium, and accidental or natural death indemnity, paid under the provisions of such policy, whether by suit, compromise, or otherwise."

Rolf's motion to dismiss was sustained in Federal Court. Meanwhile the insured had sued in Pulaski Circuit Court. This proceeding was dismissed by agreement, and payments were resumed.

June 25, 1937, Rolf assigned to Poe half of the monthly disability payments and a fourth of any amounts that might become due because of accidental or natural death. Rolf's wife joined in this instrument.

Poe died May 8, 1941, and C. E. Johnson qualified as administrator and has continued as such.

There is no appeal from that part of the decree denying appellee's prayer for recovery of $1,550—the amount collected in excess of $2,000. It is conceded that claim for this item was not filed with the administrator within the statutory period of one year.

Attorneys for appellee say in their briefs that appellee's signature was obtained while he was suffering from extreme illness, "and was in no mental condition to understand what was being done." It is asserted that he relied solely on the integrity of his attorney, and that Mrs. Rolf acted on instruction of her husband.

It is axiomatic that an attorney occupies a position of trust respecting business and matters entrusted to him and communications made. Although prior to creation of the relationship each deals with the other in his own interest, their positions ordinarily are unequal. While the client is presumed to be competent to protect his rights in making arrangements with his attorney— and in that respect the attorney is not acting for the person who is about to become a client—still (with but rare

exceptions) the lawyer's knowledge respecting probabilities of success, his understanding of the work involved, and his ability to appraise with reasonable accuracy the elements of time, effort, risk, and research—these things are peculiarly within the attorney's province.

No rigid rule can be laid down to circumscribe the bounds beyond which the attorney may not go. It is sufficient to say that in the vast majority of cases clients receive the highest degree of consideration and are not coerced, deceived, or overreached. Perhaps in the instant controversy there was no intent to do so: merely an error in calculating the full return. It is difficult to believe that if Poe had survived he would have insisted upon full execution of the letter of the contract. We prefer to assume that after receiving $2,000—double the amount originally asked, because payment was contingent—the account would have been satisfied, and the transaction would not be treated as insurance for the benefit of the attorney.

There is no doubt that Rolf signed the papers. His signature, *per se*, is admitted; and if he was not overreached the payments should be upheld, and effect would be given the agreement of September 2nd, to the exclusion of oral understandings. It cannot be said that essentials of the discussions relating to a fee were not merged with the writing of September 2nd. If it were necessary to decide whether the contract of September 2nd, or that of December 14th, controlled we would hold in favor of the former.

There is testimony—and we think it preponderates—that Poe's written proposals were read to Rolf. This, in the absence of relationships that were subject to the closest scrutiny, would justify a holding that the insured voluntarily subscribed and understood what the terms were.

Rolf's contention is that because of physical afflictions and bodily pain, he was mentally or emotionally disabled to an extent which deprived him of capacity to appreciate (if he understood) the full significance of his

act. The plea is that having been told by Poe that a cash fee of $1,000 (or $2,000 contingent upon recovery) would be appropriate, he did not observe the changes. While the agreements were being read to him he assumed they substantially embraced the terms verbally agreed to. The clear inference to be drawn from appellee's testimony is that he did not say or do or indicate anything that would justify the attorney in believing that a continuing obligation, indeterminable as to amount, was to be substituted. In the absence of any conduct on appellee's part justifying Poe in believing that substituted terms would be satisfactory, appellee says he had a right to think that no greater burden was being imposed than possible payment of $2,000.

We recognize and emphasize the principle that an unambiguous contract, entered into by competent parties, and relating to matters as to which there is no statutory interdiction, is binding upon those who make it, provided it is not contrary to public policy. Certainly, when such parties engage in preliminary discussions regarding their purposes, and seemingly reach an agreement, then reduce their accord to writing, parol testimony will not be heard in contradiction.

In *Norfleet* v. *Stewart,* 180 Ark. 161, 20 S. W. 2d 868, Chief Justice HART expressed the views of the Court regarding the relationship between attorney and client [after the contract had been entered into] as one forbidding the attorney to misrepresent any fact. On the contrary, said the Chief Justice, there must be an entire absence of concealment or suppression of any facts within the attorney's knowledge which might influence the client, and the burden of establishing fairness of the transaction under investigation rests upon the attorney.

Approved principles are stated in *Thweatt* v. *Freeman,* 73 Ark. 575, 84 S. W. 720, a quotation being: ''Equity regards the relation of attorney and client much in the same light as that of guardian and ward, and will relieve a client from hard bargains or from an undue advantage secured over him by his attorney. And the

client, in order to secure such relief, is not bound to show that there has been any imposition or fraud, nor is the transaction necessarily void; but if it is a transaction in which the relation between the parties exerted, or might reasonably have exerted, any influence in the attorney's favor, then the burden of establishing its perfect fairness is thrown upon the attorney.''

We think that in preliminary discussions which have for their purpose creation of the relationship of attorney and client, good faith is likewise demanded. The attorney belongs to a profession recognized by law. His conduct is impliedly avouched by the authority which certifies his qualification to enter the field and to continue in the practice.

In the case at bar strong circumstantial evidence supports Rolf's contention that after Poe had accepted employment to reinstate disability payments, under a contract Poe wrote, which fixed compensation at half of the recovery of $100 per month, he obtained signatures to the contract of December 14th, and to the assignment. The second contract allowed an additional fee of twenty-five percent of the death benefits. This occurred at a time when the Insurance Company admitted incontestability of the principal policy.

The fact that Poe prevailed upon Rolf to sign an agreement vastly increasing his interest after the attorney had stated what his fee to conduct the litigation would be, discloses imposition of the attorney's will to the exclusion of Rolf's capacity to act with discretion. The Chancellor seemingly thought Rolf had been overreached, and believed in the circumstances of the case there was want of accord. In fact. the attorney's control was such as to vitiate the contracts and assignment, and relegate appellant to a *quantum meruit* basis.

Affirmed.

McFADDIN, J., dissenting. The basis of my dissent is that I adhere to the conviction that the contract of September 2, 1936, between Poe and Rolfe should be sus-

tained, and the rights of the parties measured by that contract.

In order to demonstrate the reasons that impel this conviction, I will recite the facts in considerable detail, preliminary to the conclusions to be drawn from such facts.

On March 2, 1927, William A. Rolf received an insurance policy contract on his life for $10,000 from the New York Life Insurance Company. This contract had three main provisions: (1) that in case of total permanent disability of Rolf, premiums would be waived, and the insured would receive $100 per month for life; (2) on the natural death of Rolf, the beneficiary (appellee's wife, Regina Rolf) would receive $10,000; and (3) in case of accidental or violent death of the insured, the beneficiary would receive $20,000. I refer to these provisions as (1) disability benefits; (2) death benefits; and (3) accidental death benefits. The consideration of the policy was an annual premium of $481.90. Nine annual premiums were paid by the insured; and on December 24, 1935, the insurance company found the proof of total permanent disability to be sufficient (an arthritic condition and heart trouble had developed), and waived further premiums, and commenced the payment to the insured of $100 per month under the disability benefit provision.

The insurance company continued these monthly payments until August 21, 1936, when the company advised the insured and the beneficiary, by, letter, that certain misrepresentations had been made by the insured in the original application in 1927. The company suspended further disability benefit payments, and tendered return of so much of the premiums as covered the disability benefits. The company also gave notice that the death benefit and the accidental death benefit provisions of the policy would forfeit unless adequate premium payments were resumed.

Within a week or ten days after the receipt of this letter from the insurance company, the appellee went to

the office of Tom Poe, then a successful practitioner of the Little Rock bar, and employed Poe to represent appellee against the insurance company for resumption of payments of the monthly disability benefits. A written contract was introduced in evidence by the appellee, and, omitting signatures, it is as follows:

"This agreement, made and entered into on this the 2nd day of September, 1936, by and between William A. Rolf, of Little Rock, Arkansas, party of the first part, and SAM T. & TOM POE, attorneys of Little Rock, Arkansas, parties of the second part.

"Party of the first part hereby employs parties of the second part to represent him in the prosecution of a claim against New York Life Ins. Co., for money due him by reason of insurance issued by this company.

"Party of the first part hereby agrees to pay parties of the second part fifty (50%) per cent. of all sums hereafter collected whether by suit, compromise or otherwise.

"Parties of the second part undertake employment from party of the first part to represent him in his claim against New York Life Ins. Co. and agree to devote their best efforts to the prosecution of same."

The lower court found that Tom Poe was practicing law under the firm name of "Sam T. and Tom Poe," but Tom Poe alone was interested.

The appellee contends that he either made an oral contract with Poe, or that appellee understood this written contract to be different from its terms. Appellee testified: that Poe was to receive a total of $2,000, contingent on winning the suit against the insurance company; and that this $2,000 was to be paid at the rate of one-half of each payment received from the insurance company until the total of $2,000 had been paid; and that the $2,000 was to be in full to Mr. Poe. I refer to the appellee's contention as "the alleged oral contract."

On November 27, 1937, the New York Life Insurance Co. filed suit in the United States District Court at

Little Rock against the insured, William A. Rolf, and his beneficiary, Mrs. Regina Rolf, seeking cancellation of the total permanent disability benefit and the accidental death benefit clauses of the policy, and demanding return of the $600 paid to the appellee under the disability benefit provision, and demanding the resumption of premium payments on the death benefits portion of the policy.

In the case pending in the federal court, Poe filed a motion to dismiss; and the motion was argued, and written briefs were filed. On March 12, 1937, while the federal suit was pending, Poe filed suit for William A. Rolf against the insurance company in the Pulaski Circuit Court to secure resumption of payment of monthly disability benefits and waiver of all premiums. The insurance company answered that suit. On March 30, 1937, the federal court sustained the motion to dismiss the federal suit. Mr. A. F. House, who represented the insurance company in both suits, was called as a witness by appellee in the case at bar. Mr. House's testimony shows how chivalry still exists in the legal profession, because he spoke of his erstwhile adversary (now deceased) in these words:

"Mr. Poe was a very experienced insurance lawyer. In fact, he 'trimmed' me time after time. . . . He not only had the reputation (of being a very capable insurance lawyer), but he was, for a fact."

After the motion to dismiss was sustained in the federal court, an agreement was reached whereby the insurance company abandoned the proposed appeal of the federal case, and secured the dismissal of the case in the state court. In return, the insurance company paid all of the monthly disability payments that had been withheld, and resumed payment of the monthly disability benefits thereafter, and waived all premiums on the entire policy contract. In short, Tom Poe obtained a complete victory. This was effected on June 25, 1937; and on that date the appellee and his wife executed and acknowledged an assignment addressed to the insurance

company, assigning to Tom Poe and his executors, administrators, and assigns "50 per cent. of all . . . monthly installments of disability benefits . . ." under the policy involved. The assignment was witnessed and acknowledged, and forwarded to the insurance company; and the insurance company paid the accumulated and unpaid $1,200 of monthly disability benefits, and this amount was divided equally between appellee and Tom Poe.

Thereafter, each month the insurance company sent the $100 check payable to "W. A. Rolf and Sam T. & Tom Poe, attorneys"; and Mr. Rolf would indorse the $100 check and deliver it to the office of Tom Poe and receive in return the check of Tom Poe for $50; or Tom Poe would indorse the $100 check when he received Rolf's check for $50. In short, division was made of each monthly check. By approximately September, 1939, Tom Poe had received a total of $2,000; and appellee contends that that $2,000 was all that Tom Poe was to receive. Nevertheless, the division of the monthly checks continued as before, until the death of Tom Poe on May 8, 1941. C. E. Johnson was appointed administrator of the estate of Tom Poe in June, 1941, and this equal monthly division of the checks continued until 1942, when the insurance company withheld further payments because of failure to receive a certified copy of the letters of administration of C. E. Johnson. By this time, Tom Poe and his estate had received a total of $3,550 under the contract and assignment.

On July 1, 1942, the appellee instituted this suit in the Pulaski Chancery Court, claiming: that the "alleged oral contract" was the governing agreement concerning the fee; that the two written contracts and the assignment should be canceled as obtained through overreaching and constructive fraud; that appellee should recover $1,550 from the estate of Tom Poe; and that the New York Life Insurance Company should make all future payments direct to appellee. Issue was joined upon answer filed by Johnson as administrator, the intervention of Lowery as guardian, and the reply to the interven-

tion. The chancery court sustained the alleged oral contract, and canceled the written contract between Poe and appellee.

I. *The Written Contract of September 2, 1936, Should be Sustained, and the Rights and Duties of the Parties Determined by that Contract.* Some of the reasons that impel me to this conclusion are:

(a)  Appellee admitted executing this contract.

(b)  It was dated within a week or ten days from the time appellee received the letter of August 21, 1936, from the insurance company; and appellee testified that this was about the time that he first went to see Poe.

(c)  Appellee never fixed any date of any oral contract of employment prior to September 2, 1937.

(d)  Appellee continued to divide the monthly checks long after Poe had received the $2,000.

(e)  Appellee continued to refer to his "understanding of the contract," rather than to testify that any oral contract superseded the written contract of September 2, 1936.

Rolf testified on direct examination:

"Q.  Do you remember how many contracts you did sign, first and last, in this case? A. No, I don't really. It seems to me like I signed one when Mr. Poe and me come to an agreement on the price of handling the case."

. . . .

"Q.  Mr. Rolf, of course, when you went up to see Poe & Poe, you talked with Mr. Tom Poe? A. That's right. Q. And you discussed with him the terms under which he was to take the case? A. That's right. Q. And you recall what those terms were, yourself? A. Yes. Q. I hand you this contract and ask you: is that your signature on the bottom? A. Yes, sir; I think it is."

. . . .

"Mr. Owens: If Your Honor please, we offer in evidence this agreement dated September 2, 1936. Court:

Let it be introduced. Q. (Mr. Owens continuing): Did you understand you were signing an agreement to give him 50 per cent? A. No, I did not; my understanding was he was to get—he asked me—he wanted $1,000 for his part, cash."

Then the appellee (over the objections of the appellants duly preserved) detailed that Mr. Poe had offered to represent appellee for $1,000 cash, but appellee did not have the cash; and Poe offered to take the case on a contingent fee of $2,000 with payments to be made at the rate of 50 per cent. of every monthly disability payment until Poe received the $2,000, which was to be in full.

It is clear from appellee's testimony that his understanding of the terms of Poe's employment were contemporaneous with the execution of the written instrument of September 2, 1936. Of course, under these facts the written contract merged into its terms any oral contract or understanding, and the written contract governs over the appellee's mere understanding. Mrs. Regina Rolf testified that she went with her husband to Poe's office "only when he (her husband) asked me to go and sign the paper." Since she did not sign the contract of September 2, 1936, it is clear that she was not in the office at that time, and her understanding could not have been gained from the original conversation. Whether we view the alleged oral contract as contemporaneous with the written contract, or as merely the appellee's understanding of the written contract—in either event —the result is the same: the written contract governs. All previous negotiations are merged into the written contract. *Standard Rice Co., Inc.*, v. *Dilday*, 191 Ark. 754, 87 S. W. 2d 588; 6 R. C. L. 839. An understanding of one party cannot be used to vary the written contract. *Mitchell Mfg. Co.* v. *Ike Kempner & Bro.*, 84 Ark. 349, 105 S. W. 880; *Stone* v. *Prescott Special School District*, 119 Ark. 553, 178 S. W. 399; *Outcault Adv. Co.* v. *Bradley*, 105 Ark. 50, 150 S. W. 148; 22 C. J. 1070; 32 C. J. S., Evidence, 892.

The rule is well established that when a transaction between an attorney and client is attacked, the burden is

cast on the attorney to show that the transaction was made in the best of faith and without disadvantage to the client, and that it was fair and equitable. *McMillan* v. *Brookfield,* 150 Ark. 518, 234 S. W. 621; *Swaim* v. *Martin,* 158 Ark. 469, 251 S. W. 26; *Powell* v. *Griffin,* 178 Ark. 788, 13 S. W. 2d 18; *Thweatt* v. *Freeman,* 73 Ark. 575, 84 S. W. 720; *Baker* v. *Humphrey,* 101 U. S. 494, 25 L. Ed. 1065;.5 Am. Juris. 289. In the case here, Poe took the contract of September 2, 1936, with Rolf at the inception of the employment; and until a contract was made, the relationship of attorney and client did not exist. See *Hoskins* v. *Adkins,* 184 Ark. 124, 4 S. W. 2d 753, and *White & Black Rivers Bridge Co.* v. *Vaughn,* 183 Ark. 450, 36 S. W. 2d 672. The opinion in *Hoskins* v. *Adkins, supra,* has in it many statements that might well be quoted here.

Notwithstanding the absence of the attorney-client relationship until the employment was agreed to, nevertheless, the appellants, to show the reasonableness of the fee charged, offered proof that a contingent fee of 50 per cent. of the recovery was a reasonable fee in a case like this one. This was shown by an attorney of thirty-two years' experience, and of state-wide reputation; and appellee offered not the slightest evidence to dispute the reasonableness of the fee. The fact that the fee was contingent did not make the contract void. *Davis* v. *Webber,* 66 Ark. 190, 49 S. W. 822, 45 L. R. A. 196, 74 Am. St. Rep. 81. In fact, under the fee arrangement of September 2, 1936, Poe took the risk that appellee might die within a few months: in which event Poe would have received a very small amount for his services.

The appellee was competent to contract. He was a person *sui juris,* and sues here in that capacity. He is not represented by a guardian, and there is no serious claim that he is now, or ever has been, other than *sui juris.* Mr. L. B. Branch, while sheriff of Pulaski county, was called as a witness by the appellee to testify as to appellee's feeble faculties, as tending to show how easily appellee might have been overreached by Poe; but Mr. Branch admitted on the witness stand that he had pur-

chased real estate from the appellee as late as 1941. These questions were propounded to the witness, Branch, and the answers given, as follows:

"Q. Are you still interested with him? A. No, I bought him out a year ago. Q. What was it you bought from him? A. Some property we held in the city."

. . . .

"Q. You took a deed from him and his wife? A. I did. Q. You did not have any guardian appointed, did you? A. I did not. Q. You thought he was competent to execute a deed, didn't you? A. He had never been pronounced insane, and I thought it was all right."

If the sheriff of the county, and a co-tenant with Rolf, thought he could accept a deed from Rolf, then I fail to see why the contract with Poe should be judged by any other standard, especially when the insurance company was claiming physical ills, and not mental ills, as the condition antedating the policy; and no physician testified that Mr. Rolf ever had any mental disorder; and the hospital record of former illnesses had no mention of any mental disorder. I mention this matter of mental condition—not because it was pleaded—but because it bears on the good faith of the attorney in taking the contract. The attorney acted just as Mr. Branch acted; and Branch was the witness called by the appellee.

I, therefore, conclude that the written contract of September 2, 1936, merged into its terms all previous and concurrent conversations and understandings, and cannot be varied or changed by parol evidence in this case. The rights and duties of the parties are measured by that contract.

II. *The Construction and Interpretation of the Contract of September 2, 1936.* This being an equity case, the court may interpret and construe the contract; and this I proceed to do, remembering always the rules for the construction of contracts, some of which are: (a) The court may acquaint itself with the persons and circumstances, and place itself in the same situation as the

parties at the time the contract was made, and judge the meaning of the words from that position. *Ford Hardwood Lumber Co.* v. *Clement,* 97 Ark. 522, 135 S. W. 343, and other cases listed in West's Arkansas Digest, "Contracts," §§ 143 and 169. (b) The intention of the parties should be gathered from the whole instrument. *Read's Drug Store* v. *Hessig-Ellis Drug Co.,* 93 Ark. 497, 125 S. W. 434, and other cases listed in West's Arkansas Digest, "Contracts," § 147 (3). (c) An ambiguous contract should be construed most strongly against the person preparing it. *Leslie* v. *Bell,* 73 Ark. 338, 84 S. W. 491, and other cases listed in West's Arkansas Digest, "Contracts," § 155.

The contract of September 2, 1936, has already been set out *in extenso* in this opinion; and consists of four sentences. The first sentence identified the parties. In the second sentence Rolf employed Poe to represent Rolf "in the prosecution of a claim against New York Life Insurance Company for money due him by reason of insurance issued by this company." The parties clearly had reference to the monthly disability benefits, which was the only money that could ever come to Rolf under the insurance policy. The death benefits (natural or accidental) would go to the beneficiary. These monthly disability benefits could not be recovered until the policy was reinstated by the insurance company; and, upon such reinstatement, Rolf would receive money from the insurance company; and that was the claim that Poe was to prosecute. Such reinstatement of the policy necessarily carried with it the waiver by the company of future premiums, the restoration of death benefits, and of accidental benefits.

What was Poe to receive for his services? Rolf agreed in the third sentence to pay Poe 50 per cent. of all sums collected. Naturally, this meant sums collected by or for Rolf on the monthly disability payments. That was the only money that could ever come to Rolf. The contract necessarily meant that Poe would get the policy reinstated, and would receive 50 per cent. of the monthly

disability benefits, as long as they were paid. There was no limitation of time or amount, and none may be shown by oral testimony—as I have previously explained.

In the fourth sentence, Poe agreed to use his best efforts to perform the contract on his part. He did this as I have previously detailed; so Poe's estate is entitled to 50 per cent. of the monthly disability benefits as long as the same may be paid; and I am convinced that the chancery court was in error in holding otherwise.

The majority is striking down the written contract of September 2, 1936. For that reason, I dissent; and I am authorized to state that Mr. Justice FRANK G. SMITH and Mr. Justice MILLWEE join me in this dissent.