R. H. SIKES *v.* Joseph William SEGERS, Jr.

79-60                                          587 S.W. 2d 554

Opinion delivered October 15, 1979
(In Banc)

656

*William R. Wilson, Jr., P.A.,* for appellant.

*Shaw & Ledbetter,* for appellee.

CARLETON HARRIS, Chief Justice. This is the second appeal of this case. *Sikes* v. *Segers,* 263 Ark. 164, 563 S.W.2d 441, reflects that the trial court ruled that appellant's action for alienation of affection was barred by the statute of limitations, and this holding was not appealed by appellant. The trial court also held that the malpractice action brought by Sikes against appellee was not barred by the statute of limitations, and this ruling was not appealed. However, appellee asked for a summary judgment, which the court granted due to its finding that appellant's handwritten affidavit (prepared during the recess of the court) had not been

timely filed. The affidavit controverted the allegations and statements in the motion for summary judgment, and accordingly, raised a factual issue. We, because of the facts and circumstances of the particular case, concluded that "The only fair and reasonable action would have been to permit the affidavit to be filed;" consequently, we reversed the court's action in granting summary judgment and remanded the case for further proceedings.

In the present case, appellant filed motions on August 2 (heard by the trial court on August 4, 1978) and August 14[1] for continuances, it being maintained that his present attorney, because of a previous commitment, could not appear on the date of trial (August 15). The case was already set for August 15 and the trial court stated that it would proceed to trial. On August 15, neither appellant nor his attorney appeared, and the court entered an order reflecting that the motions for continuance had been denied, dismissing with prejudice the complaint of appellant, and awarding all costs to appellee. From the order (judgment) appellant brings this appeal. The case is somewhat difficult to follow because separate hearings were conducted involving different attorneys, and there is considerable background relating to the reasons for the hearings.

It is first argued that the trial court erred in refusing to grant motions for a continuance. These motions were predicated on appellant's contention that the attorney who had been representing him was no longer in a position to properly present his case. This attorney was C. W. Knauts, who lived in Clay County. The basis of the contention was that Lewis Jones, a partner of appellee, had filed a defamation of character suit against Sikes and Knauts on September 28, 1977 and, according to Sikes, Knauts wanted to settle the matter by swapping dismissals of lawsuits, i.e., Sikes would dismiss his malpractice action against Segers and Jones would dismiss the suit he had filed against Sikes and Knauts. Sikes said that he did not want to follow this suggestion; that he felt the two lawsuits were entirely separate and Knauts had a conflict of interest and could not afford him the best representation in his (appellant's) action against Segers. The

---

[1]This motion was received in the mail.

trial court, having received a letter from Knauts concerning his desire to withdraw as attorney for Sikes (in which was enclosed a letter from Sikes wherein Knauts was discharged), conducted a hearing on July 27, 1978 to determine whether there was reason to discharge Knauts. In addition to the reason just given, Sikes complainted that his lawyer did not meet with him or talk with him prior to the taking of his deposition. Principally, however, his complaint was that Knauts wanted to settle both lawsuits in the manner heretofore mentioned.

Knauts said that he and his client had not agreed for several weeks on the manner of handling the litigation and stated:

> In accordance with the court's urging counsel to settle the case, I have endeavored to try to work to that end, by my counseling and discussions with Mr. Sikes, I feel have precipitated a riff between us.

The court interjected:

> But it was at my request. I request it in every case. I try to pre-try every case and try to settle it; not just this case.

Knauts added that there was no question but that he and Sikes had completely different viewpoints as to how the case presently before us should be pursued and that:

> In keeping with what I have felt was in line with the instructions of the court, to explore all avenues of settlement — in fact, I have passed this information on to Mr. Sikes. And when I did this and during the time that the court asked that it be done, this is when Mr. Sikes felt ill at ease with me, . . .

Knauts stated that he had felt no "pressure" from the case filed by Jones; that his attorney had advised him that that case was completely defensible and he felt that his participation in it was personally defensible, but he did feel that Sikes thought there was a conflict. Sikes, who had caused

some tapes to be made of purported conversations between his wife and appellee (subsequently discussed) testified that his attorney had told him that there was "no way" that the court could "touch those tapes during that deposition;" when the court impounded the tapes, apparently his confidence in his counsel was eroded. Knauts stated that he did tell Sikes that since there was no motion filed to suppress the tapes, he did not think it would be proper for the court to do so, and Knauts further stated that one of the differences between him and Sikes was that appellant wanted to take the matter to the State Supreme Court Committee on Professional Conduct for the purpose of disciplining Segers; he (Knauts) was against that procedure and would have no part in it. The court permitted Knauts to withdraw from his representation of Sikes and told the latter that he could get another attorney, but there would be no continuance from the August 15 trial date, and an order was entered to that effect; the court also told Sikes to advise any new attorney that he did not permit the taking of depositions within 30 days before the trial date.

Thereafter, Sikes obtained William R. Wilson, Jr., of Little Rock to represent him, and Wilson filed motion to compel discovery, motion for substitution of counsel, motion for continuance, and motion to Recuse.[2] Appellee filed a motion to impound and to suppress the tapes, heretofore mentioned. As to the motion for continuance, Wilson stated that he had a conflict on August 15 and could not possibly be present on the date of trial. Appellee vigorously opposed the granting of a continuance and points out to this court the length of time that the suit has been pending. Of course, the divorce action commenced in 1973, and there were numerous hearings relative thereto, but in our view, the cases are entirely separate and distinct causes of action. Primarily it must be recognized that the divorce matter involved litigation between Sikes and his wife, while the current action is litigation between Sikes and his alleged attorney. This malpractice action was filed by the Sam Sexton law firm on February 3, 1976, but was dismissed without prejudice the next day and Sexton withdrew from the case. Sikes testified that this dismissal without prejudice was done by one of the attorneys

---

[2]This motion was denied, but is not raised on appeal.

without his knowledge or consent. It does not appear that there is any evidence to the contrary.

Further background reflects that on January 17, 1977, a second malpractice action was filed by Knauts, retained in late 1976 by appellant. On February 3, appellee filed an answer, and on May 12 the trial court granted summary judgment in favor of appellee. This judgment was appealed on July 8. On September 28, Lewis D. Jones, partner of appellee, filed a defamation suit against appellant and Knauts. On March 27, 1978, as earlier reflected, this court reversed the trial court on the granting of summary judgment as to malpractice. Actually, there was nothing for Sikes and Knauts to disagree about until after the reversal, for if we had affirmed the case, instead of reversing it, there would have been no malpractice cause of action to "swap" with Jones. The dissatisfaction of Sikes seems to have commenced (according to the testimony of Sikes) around the last of April when, according to his testimony, Knauts made this suggestion. Other complaints were that his attorney did not brief him on the taking of a discovery deposition which was set for July 7. This deposition was postponed until July 14 because of the illness of Knauts. Sikes testified:

> As a matter of fact, he notified opposing counsel that he was sick and I had to call the office to get that information. Then when it was reset I ended up finding out the Thursday morning of the hearing that the deposition was set for that afternoon. I found that out Thursday morning by myself, by calling the office.

Of course, a client has a right to discharge an attorney, though there may not be just cause. *Johnson* v. *MoPac Railroad Co.,* 149 Ark. 418, 233 S.W. 699; *Gentry* v. *Richardson,* 228 Ark. 677, 309 S.W.2d 721. See also *Code of Professional Responsibility,* DR 2-110(b)(4). While the trial court found that Knauts had represented Sikes in a capable manner, he did grant the attorney's petition to withdraw. Of course, according to the testimony of both Sikes and Knauts, they were in total disagreement as to the procedure to be followed and apparently had lost confidence in each other. Certainly, their feelings were not compatible with the attitude that an attorney and

client should have in preparing for litigation.

The court's order approving the petition of Knauts was granted on July 27. That left appellant 18 days to obtain an attorney. Obtaining an attorney in the Fayetteville area would have been most difficult, and it is easy to understand his acquiring an attorney from an outside area; even at that, he did obtain the services of Wilson within four or five days, though Wilson advised that he could not try the case on that date. The record reflects that Sikes had also made other efforts to obtain counsel, but had been unable to do so. Of course, if it appeared that appellant was simply trying to delay the trial and had no *bona fide* reason for a continuance, the court's denial of such continuance would be correct. The record does not support this inference. Nor is this a matter where the attorney is contending that he had inadequate time for preparation; rather, he simply had a conflict on August 15. As already pointed out, the state of feeling between appellant and his attorney was such that adequate representation by that attorney would have been difficult, if not impossible. Actually, the court advised that no continuance would be granted even before it was requested, so it appears that no consideration was given to the motion, or the reasons therefor. Of course, the question of whether a continuance should be granted is pretty well determined on the facts of the particular case, and we have reached the conclusion that, under the facts of this case, there was an abuse of discretion in not granting the motion.

It is asserted that the trial court erred in denying appellant's motion to compel appellee to complete discovery by answering questions concerning appellee's alleged meretricious relationship with Jolene Sikes. On July 17, 1973, appellant and his wife, Jolene Sikes, had met with appellee for the purpose of discussing a property settlement pursuant to obtaining the divorce. Mrs. Sikes had gone to appellee for representation, and appellant alleged that Segers also represented him. In general, he contended that subsequent to his wife's obtaining Segers as her attorney, the two engaged in a meretricious relationship, which influenced Segers' recommendations (to the detriment of appellant) in the property settlement. On July 14, 1978, discovery depositions

were taken from Segers and Sikes[3] and made exhibits at a hearing before Judge Cummings on August 4.

Let it first be understood that a meretricious relationship between Jolene Sikes and appellee would be immaterial to any question here presented *unless Segers was representing appellant.* Of course, if appellee and Mrs. Sikes were having an affair, any advice given to appellant could have been affected by the personal relationship with Mrs. Sikes. Certainly, such a situation could not be countenanced in observing professional ethics, but the duty of an attorney to his client goes far beyond ethics. Unquestionably, the relationship between Segers and Sikes (if Segers was representing Sikes) was a fiduciary relationship. On *American-Canadian Oil & Drilling Corp.* v. *Aldridge & Stroud,* 237 Ark. 407, 373 S.W.2d 148, this court said:

> The primary question for determination is whether the Attorneys did, either in fact or as a matter of law, represent conflicting interests by acting in their dual capacity as attorneys for appellant and Aldridge & Stroud, for if such were the case we would unhesitatingly hold that *they thereby forfeited all rights to any compensation.* No rule of law is more firmly established than that — 'A fiduciary relationship exists between attorney and client, and the confidence which the relationship begets between the parties makes it necessary for the attorney to act in utmost good faith.' *Norfleet* v. *Stewart,* 180 Ark. 161, 20 S.W.2d 868. This high fiduciary relationship positively precludes attorneys from representing conflicting interests as was well stated in *Silbiger* v. *Prudence Bonds Corporation,* 180 F.2d 917, where Judge Learned Hand observed:
>
> 'Certainly by the beginning of the Seventeenth Century it had become a commonplace that an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors. Nor will the court hear him urge, or let him prove, that in fact the

---

[3]Sikes was represented by Knauts and present counsel represented Segers on July 14.

conflict of his loyalties has had no influence upon his conduct; the prohibition is absolute and the consequence is a forfeiture of all pay.'

The following portions of the deposition appear pertinent:

Q. So Mrs. Sikes appeared there in the office, herself, first, and then later brought in Mr. Sikes; is that right?

A. Mrs. Sikes appeared there July 9, July 10, and July 16, before Mr. Sikes came into the office with Mrs. Sikes.

Q. I am sure that you have heard the testimony of Mr. Sikes in connection with his statement that you and he — I mean that you talked to him about representing both of them. Can you elaborate on that, Mr. Joe?

A. Yeah, I can, and I had personally a high regard for R.H., and really didn't feel sorry but felt remorseful that he and his wife and little ol' baby were going to split the sheet. I told R.H., with Jolene there, that I represented Jolene Sikes and as long as there was not a controversy that could not be settled between them, as long as there wasn't a controversy they couldn't settle that R.H. need not seek outside counsel. If it got to a point where there was a controversy that they could not settle, then in that event, I represented Jolene, and he would have to hire another lawyer, and I don't, you know, I tried very hard to eliminate controversy because, as R.H. said, everything that she wanted he talked her down and out of, and she was the one that was the giver, and gave, and took away from what was, in my opinion, a fair and equitable settlement, she gave away. And R.H. took away from her, and he never — the only controversies that ever arose, she gave in, which eliminated him having any controversy. But I never said that I would represent R. H. Sikes.

Segers further stated that Sikes had told him that he had discussed the case with another lawyer and appeared to have

received advice from the attorney. Continuing with the deposition:

> A. He [Sikes] took things out, too. I got off the track; I didn't answer your question. He took the property settlement agreement as was drawn up, he'd pick it up, take it out of the office, bring it back, with red lines in it or writings or markings or something, with what he wanted changed, and this sort of thing. Sometimes he would leave it there, when I was there, and sometimes he would leave it there when I wasn't there, and I distinctly recall him telling me that he had seen Jimmy Cypert concerning the property settlement agreement and this conversation came in when there was something he wanted to change; I don't remember what it was. And I told him that I wouldn't recommend to my client to accept it, and he said, 'I have seen Jimmy Cypert and that is what I am going to do.'

Subsequently, Segers testified that Cypert said he had never represented Sikes in the divorce action.

Segers took the acknowledgment of Sikes when he executed the waiver and entry of appearance for the divorce. The record reflects that members of the Sikes family had used Segers as an attorney, the latter representing the mother of appellant a few years before present litigation. Of course, in the first case, we reversed the trial court in granting a summary judgment for Segers *on the basis of an affidavit* by Sikes which we held raised a factual issue. In that affidavit, Sikes stated, *inter alia,* "that Segers agreed to represent both he and Jolene Sikes in their divorce, but did not disclose to him the relationship of Segers to his wife, that they were involved in an affair involving a physical relationship. That he paid Segers for his service as an attorney."

Thereafter, a number of questions were asked, which were objected to by counsel for appellee on the basis of being either of a privileged nature between a client and her attorney, or that they related to the alienation of affections suit which, as previously mentioned, had been dismissed by the trial court because the statute of limitations had run. Without

discussing every question asked (which does not seem necessary since the case has never gone to trial), there were some which obviously did not relate to any privilege, and likewise were relevant to a malpractice action. For instance, Segers was asked:

> Joe, it is alleged here in the Complaint of R. H. Sikes and it was also previously alleged in pleadings filed by the office of Sam Sexton that you and Jolene Sikes, after your representation of Jolene started and during the time you represented R. H. Sikes, you undertook to have a physical and meretricious relationship with Jolene Sikes?

*　*　*

> Joe, at the time you were representing Jolene Sikes in this matter, did you ever ask her for a date or ask to come over to her house and see her for any physical purpose?

*　*　*

> Joe, did Jolene Sikes ever call you up and ask you to come up to her house for the purpose of sexual relations?

All questions were objected to on the basis that they only related to alienation of affections.

While the particular questions mentioned did not refer to, nor were they objected to on the basis of, privileged communications, it appears certain that this question will arise during a trial, and a discussion of privilege is entirely in order. First, let it be said that any questions referring to *acts* of appellee and Mrs. Sikes, rather than communications between an attorney and his client, are not privileged. Also, the client is the one who is given the privilege of refusing to disclose confidential communications, and while the lawyer may claim the privilege, he can only do so on behalf of the client. See *Uniform Rules of Evidence,* Rule 502(b) and (c).

At the hearing on August 4 (passing on the motion to

compel discovery), the court held that the questions relating to a meretricious relationship dealt with alienation of affections, and were not appropriate to the question of malpractice, stating:

> The duty between this man [Segers] and Mr. Sikes is the only allegation that he has the right to put on testimony about. I think there is a difference between the alienation of affection proof and malpractice.

An order was subsequently prepared to that effect. Counsel for appellant moved that he be allowed to depose the appellee, considering that the deposition previously taken was inadequate, and said that he could take it "at one 'clock today," but the court denied the motion, pointing out that he had a rule that no depositions could be taken within 30 days of the trial date.

In accordance with what has been said, we hold that the court erred in finding that questions concerning the alleged meretricious relationship related only to the issue of alienation of affections.

It is also urged that the trial court erred in impounding and suppressing the tape recorded telephone conversations between Jolene Sikes and Joe Segers. On August 9, 1973, appellant, who had retained the assistance of Bill Murray, a private investigator, began taping telephone conversations on his home phone, such taping continuing until September 5. Murray explained to Sikes how the operation was carried out and Sikes installed the necessary equipment for the taping. At this time, the divorce action, which had been filed on July 19 by Mrs. Sikes, was still pending, the decree not being issued until August 22. Both Sikes and his wife were still living in the home, although Sikes was gone a great part of the time on golf tours. The tapes were collected by Murray and turned over to Sikes, and Sikes contends that the telephone conversations, as recorded on the tapes, establish his contention that a meretricious relationship existed between his wife and Segers. On July 14, at the taking of the discovery depositions, according to the testimony of Sikes, Judge Cummings entered the courtroom where the depositions were be-

ing taken and impounded the tapes. Appellant stated there was no hearing before this was done. The court indicated that the tapes were impounded or sequestered simply as a matter of preserving their integrity. Apparently there was no hearing at the time the tapes were impounded, but 12 days later appellee filed a motion to impound and suppress the tapes. The court entered an order providing:

> That the Defendant's Motion to Impound and to Suppress Tapes should be granted in that the tape recordings of certain telephone conversation were illegally obtained and are, therefore, inadmissible as evidence and shall be retained by this Court until further Orders are issued, and that the Court's Temporary Order of July 14, 1978 impounding said tape recordings shall remain in full force and effect; the Court further finds that said tapes and the use of said tapes by the Plaintiff or any material obtained therefrom should be suppressed in that the tapes or any material obtained therefrom are inadmissible as evidence.

Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. §§2510-2520, for the dual purpose of protecting the privacy of wire and oral communications, and delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause. *U.S. Cong. & Admin. News,* Vol. 2, 1968, P. 2153.

The question of the admissibility of these tapes as direct evidence has been briefed to a degree by both sides, such matters being discussed as to whether under particular circumstances the evidence is admissible, and whether the provisions of the Omnibus Crime Control and Safe Streets Act apply only to criminal matters, and while there are but few cases cited, it is apparent that conflicting views have been

expressed. The briefs, however, fail to cite case authority on the question of the court's right to impound the tapes, particularly whether this can be done prior to a hearing. Likewise, the briefs are inadequate upon the question of whether the tapes, if not admissible as substantive evidence in the case in chief, could be used for impeachment purposes. The second question is as important as the first. Only one case is cited on this last question.

These are matters that should be presented at the trial itself, and we decline at this time to pass on the admissibility of the tapes, either as substantive evidence or the use of such for impeachment purposes.

On the whole case, for the reasons enumerated herein, the order (judgment) of the circuit court entered on August 15, 1978, is reversed, and the cause is remanded to the Circuit Court of Washington County for further proceedings not inconsistent with this opinion.